UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                                      :
KOURIOCKEIN VANN,                                     :
                                                      :
                              Plaintiff,              :
                                                      :
              v.                                      :
                                                      :
BRIAN FISCHER, *et al.*,                              :
                                                      :
                              Defendants.             :
                                                      :
----------------------------------------------------X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: August 25, 2014 |

11 Civ. 1958 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

    Plaintiff Kouriockien Vann, proceeding *pro se* and currently incarcerated at Green Haven Prison, brings this action against numerous prison officials and administrators alleging (i) that the regulations of the New York State Department of Corrections and Community Supervision ("DOCCS") have impaired his constitutional right to the free exercise of his religious beliefs, and thus violated the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment; and (ii) that prison officials have impermissibly abused him and subjected him to retaliatory and harassing conduct.  Pending before the Court is Defendants' motion for summary judgment as to all claims.  As to Plaintiff's constitutional claims, the Court finds that, to the extent the challenged DOCCS directives burden Plaintiff's religious exercise, any burden is outweighed by the critical penological interests that are served by the directives, which are as well the least restrictive alternatives available.  Plaintiff's retaliation claims, by contrast, are

procedurally barred, either because of Plaintiff's failure to exhaust available administrative remedies or because of claim preclusion.  Accordingly, Defendants' motion is granted in its entirety.

## BACKGROUND[1]

### A.   Factual Background

Plaintiff brings this suit pursuant to 42 U.S.C. § 1983, claiming violations of his Free Exercise and Equal Protection rights under the First and Fourteenth Amendments, and of the Religious Freedom Restoration Act of 1993 ("RFRA"), Pub. L. No. 103-141, 107 Stat. 1488, *codified at* 42 U.S.C. §§ 2000bb through 2000bb-4.  (Am. Compl. 3 of 22).  Most of these claims arise from incidents in which prison officials deprived Plaintiff of the ability to wear the sacred beads necessary to the practice of his Santeria faith, or harassed him for wearing them.[2]  One incident occurred upon Plaintiff's arrival at Downstate Correctional Facility ("Downstate") in January 2010.  Another happened during

---

[1]     The facts are drawn from the Amended Complaint ("Am. Compl."), the deposition of Kouriockien Vann ("Vann Dep."), the Declaration of Cheryl Morris ("First Morris Decl.") and its associated exhibits ("First Morris Decl. Ex."), the First Declaration of Michael Kirkpatrick ("First Kirkpatrick Decl."), the Second Declaration of Michael Kirkpatrick ("Second Kirkpatrick Decl."), and the exhibits attached to Plaintiff's opposition to Defendants' motion for summary judgment ("Pl. Opp. Ex.").  Where references include page citations in the format "1 of X," the citation uses the pagination imposed by the Court's electronic case filing ("ECF") system.  Because of the unusual manner in which certain exhibits were docketed, the corresponding docket number is also provided with each such citation to those exhibits.

Defendants' memorandum of law in support of their motion for summary judgment is referred to as "Def. Br.," Plaintiff's opposing brief as "Pl. Opp.," and Defendants' reply memorandum as "Def. Reply."  Plaintiff's Statement of Undisputed Facts is referred to as "Pl. 56.1," and Defendants' Statement of Undisputed Facts as "Def. 56.1."

For ease of reference, the Court will adopt the parties' practice of referring to the individual defendants by surname alone.

[2]     For a more extensive discussion of this element of Santeria belief and practice, see *Campos* v. *Coughlin*, 854 F. Supp. 194, 201-02 (S.D.N.Y. 1994).

his transport from Sing Sing Correctional Facility ("Sing Sing") to Attica
Correctional Facility ("Attica") in September 2010.  And a series of allegedly
abusive and harassing incidents transpired in late 2010 and 2011, while
Plaintiff was housed at Attica.

### 1.    Plaintiff's Free Exercise Claims

The first alleged violation of Plaintiff's constitutional rights occurred
upon Plaintiff's arrival at Downstate on January 4, 2010, when several
defendants seized his sacred beads.  (Am. Compl. 4 of 22).[3]  According to
Plaintiff, during his initial intake, unnamed corrections officers sought to
confiscate Plaintiff's beads as contraband.  (Vann Dep. 41-43).  Plaintiff alleged
that he was pressed against the wall during this search, and that one
corrections officer screamed in his face.  (*Id.* at 44).[4]  Defendant Zuran, a
sergeant at Downstate, approached as Plaintiff's beads were confiscated.[5]
Plaintiff sought Zuran's assistance, explaining that he believed he had a legal
right to possess his beads.  (*Id.* at 42).  Plaintiff even provided Zuran with a
copy of an earlier decision from this District, *Campos* v. *Coughlin*, 854 F. Supp.
194 (S.D.N.Y. 1994), that is discussed at greater length below.  (*Id.*).

---

[3]    While the Amended Complaint erroneously indicates that this alleged event took place
on January 4, 2011 (Am. Compl. 4 of 22), Plaintiff confirmed at his deposition that it
actually took place on January 4, 2010 (Vann Dep. 40-41).  This incident was
subsequently grieved under grievance number 11967-10.  (Pl. Opp. Ex. A (Dkt. #120)
46-48 of 87).

[4]    Plaintiff clarified at his deposition that his claim concerning this incident derives not
from any alleged harassment, but from the violation of his religious rights arising from
the confiscation of his beads.  (Vann Dep. 45).  And, indeed, Plaintiff did not name any
of the initial security team as defendants in this action.

[5]    Defendants' counsel has advised that this defendant's surname is in fact Zupan, but
the Court will adopt the nomenclature used consistently by Plaintiff.

As Zuran reviewed the decision, Defendant Twyman, a chaplain at Downstate, entered the draft room where this search was ongoing.  (Vann Dep. 45-46).  Twyman told Plaintiff and the officers that the beads were indeed permitted within the facility, once they had been examined and approved.  (*Id.* at 46).  Plaintiff reluctantly acquiesced, removing the beads and placing them in a bag.  (*Id.*).  The beads and Plaintiff's Santeria books were taken for examination.  (*Id.* at 47).  The religious texts were returned about a week later (*id.* at 48), and the beads were returned about two weeks after that (*id.* at 49).

The second alleged violation of Plaintiff's free exercise rights occurred during his transit from Sing Sing to Attica on September 27, 2010.  (Vann Dep. 56-57).  An unnamed security team informed Plaintiff that he could not wear his sacred beads while in transit.  (*Id.* at 58-59).  Defendant Mumin, a chaplain at Sing Sing, was nearby at the time.  (*Id.* at 59).  Plaintiff again reluctantly acquiesced; the beads were placed in a bag and left in Plaintiff's possession during his transfer to Attica.  (*Id.* at 60).[6]

Defendants submit that the officers involved in each of these incidents acted, as they were obliged to do, in accordance with applicable procedures (Def. 56.1 ¶¶ 26, 34-39, 46-55), and that those procedures are appropriate (*id.* at ¶¶ 35-37).  Defendants also point to Plaintiff's acknowledgement that neither Downstate Superintendent Perez, nor Sing Sing Superintendent Heath — both

---

[6]     Plaintiff received a misbehavior report, or "ticket," for initially refusing the order to remove his sacred beads (Vann Dep. 60-61; Pl. Opp. Ex. B (Dkt. #120) 52 of 87), for which he ultimately received disciplinary sanctions once at Attica (Vann Dep. 61).

named Defendants — had any involvement in these incidents.  (*Id.* at ¶¶ 33, 40, 56; *see also* Vann Dep. 56-59).

### 2.    Plaintiff's Retaliation Claims

Plaintiff alleges four separate incidents of abuse or harassment at Attica, each of which is claimed to constitute a violation of his rights.  As to each, Defendants respond that Plaintiff did not exhaust his administrative remedies prior to commencing his lawsuit on March 17, 2011.  (Def. 56.1 ¶¶ 58-60, 66-67).

First, Plaintiff alleges that on November 30, 2010, he suffered physical and sexual assault.[7]  He claims that named Defendants LoDestro and Keenan, along with six other unnamed officers, encircled him while armed with batons; that his watch was confiscated; that he was punched; and that he was gratuitously groped while undergoing a pat-frisk search.  (Vann Dep. 84, 90-99).  Plaintiff did not identify any injury resulting from this incident or seek medical attention as a result.  (Def. 56.1 ¶¶ 73-74).  Plaintiff pursued the state prison grievance process and obtained a final adverse determination regarding this incident on March 30, 2011.  (Pl. Opp. Ex. B (Dkt. #120-1) 32 of 51).[8]

---

[7]    The record contains conflicting accounts of when this event took place.  Plaintiff has, inexplicably and contrary to documentary evidence, maintained that it occurred on February 15, 2011.  (Am. Compl. 4 of 22; Pl. Opp. 6; Vann Dep. 89, 98).  As is clear from the grievance paperwork Plaintiff himself submitted to this Court, this incident actually took place on November 30, 2010.  (Pl. Opp. Ex. A (Dkt. #120) 27 of 87; Ex. B (Dkt. #120-1) 15-23, 26-32 of 51).  Plaintiff has provided no records relating to anything taking place on February 15, 2011, nor has Plaintiff alleged that more than one incident like this occurred.  In any event, this discrepancy in date is immaterial to the resolution of this action.

[8]    The Court ordered Defendants on April 21, 2014, while this motion was under consideration, to produce "all records related to Plaintiff's grievances regarding the complained-of incidents at Attica Correctional Facility," to the extent such records had

Second, according to Plaintiff, on March 12, 2011, Defendants Corcoran and Fleckenstein censured Plaintiff regarding the visibility of his Santeria beads above the collar line of his shirt, suggesting that if he continued to wear them he should not leave his cell. (Vann Dep. 62-65). Both Defendants later that day repeated to Plaintiff their criticism of his wearing his beads. (*Id.* at 65-66). Plaintiff pursued the state prison grievance process and obtained a final adverse determination regarding this incident on July 6, 2011. (Pl. Opp. Ex. B (Dkt. #120) 74-79 of 87).

Third, on June 29, 2011 — after filing the Complaint on March 17, 2011, and before filing the Amended Complaint on August 30, 2011 — Plaintiff was again confronted about the exposure of his beads above the neckline of his sweatshirt. Defendant Corcoran took Plaintiff out of line, photographed him from two angles (Pl. Opp. Ex. B (Dkt. #120-1) 2 of 51), and wrote him a ticket for the exposed beads (*id.* at 1 of 51). Plaintiff claims that Corcoran used unwarranted harsh and harassing language. (Pl. Opp. Ex. B (Dkt. #120) 63 of 87; Vann Dep. 77). More pointedly, Plaintiff contends that he was singled out in retaliation for naming Corcoran in the instant Complaint, which was served on Corcoran in May 2011. (Vann Dep. 77-78).

Defendant Borawski conducted a disciplinary hearing on July 2, 2011, to adjudicate the consequences of this ticket; at that hearing, Plaintiff was found

---

been produced in discovery. (Dkt. #124). Defendants produced those records on May 20, 2014. (Dkt. #125). The grievance records Defendants produced exactly tally in this respect with the grievance records Plaintiff offered in opposition to Defendants' motion. Accordingly, the Court will rely on Defendants' representation that there are no other records of Plaintiff's grievances from Attica.

guilty of displaying his sacred beads.  (Pl. Opp. Ex. B (Dkt. #120-1) 4 of 51).

Plaintiff alleges that this disciplinary hearing was unfair because Borawski

improperly refused to permit Plaintiff to call Deputy Superintendent Dolce as a

witness and otherwise showed bias in his comments during the hearing.  (*Id.* at

4-7 of 51; Am. Compl. 9 of 22).  Plaintiff started the state prison grievance

process, and received an adverse decision from the superintendent regarding

his grievance on December 5, 2011.  Plaintiff never sought an appeal of the

decision.  (Pl. Opp. Ex. B (Dkt. #120) 63 of 87).[9]

Finally, on July 26, 2011 — also before the filing of the Amended

Complaint — Defendants Spaulding and LoDestro entered Plaintiff's cell to

conduct a search.  (Am. Compl. 9 of 22; Pl. Opp. Ex. B (Dkt. #120) 81 of 87).

While within his cell, Plaintiff alleges, Spaulding poured a glass of water on

Plaintiff's Santeria books and threw them on his bed, and then hurled certain

of Plaintiff's personal items out of his cell.  (Vann Dep. 110-11).  LoDestro,

meanwhile, disarranged Plaintiff's legal paperwork.  (*Id.* at 111).  Spaulding

applied jelly to Plaintiff's shirts and legal paperwork.  (*Id.* at 112).  At some

---

[9]     Plaintiff filed a state court action pursuant to Article 78 of the New York Civil Practice
Law and Rules, appealing the result of the July 2, 2011 disciplinary hearing.  Article 78
proceedings may be used, among other things, to challenge whether a state entity made
"a determination in violation of lawful procedure, … affected by an error of law or was
arbitrary or capricious or an abuse of discretion, including abuse of discretion as to the
measure or mode of penalty or discipline imposed; or … whether a determination made
as a result of a hearing held, and at which evidence was taken, pursuant to direction by
law is, on the entire record, supported by substantial evidence."  N.Y. C.P.L.R. § 7803.

Plaintiff argued in his Article 78 proceeding, as he does here, that Borawski was biased
and that the denial of his request to call Dolce as a witness was a violation of due
process.  (Dkt. #133; Vann Dep. 82-83).  The New York State Supreme Court held that
Plaintiff's petition was "without merit," concluding that excluding Dolce's testimony was
proper and did not impair Plaintiff's ability to defend himself in the disciplinary hearing
in any way, and that Borawski showed no bias.  (Dkt. #133-1 at 43-44 of 87).

point during this episode, Plaintiff alleges Spaulding did something to desecrate Plaintiff's Santeria altar.  (*Id.* at 115; Am. Compl. 9 of 22; Pl. Opp. Ex. B (Dkt. #120) 81 of 87 (alleging Spaulding "touched and violated all items on [Plaintiff's] shrine")).  Plaintiff did not pursue the formal grievance process, but instead wrote a letter of complaint directly to the superintendent.  (Pl. Opp. Ex. B (Dkt. #120) 81 of 87).  Plaintiff received an adverse response in a memorandum on August 28, 2011, but neither sought an appeal nor initiated a formal grievance process.  (*Id.* at 84 of 87).

## B.    Procedural Background

### 1.    The Complaint and Its Amendment

Plaintiff filed the Complaint in this action on March 17, 2011, bringing claims pursuant to 42 U.S.C. § 1983 and RFRA.  (Dkt. #1).  He filed the Amended Complaint on August 30, 2011, adding several defendants and adding claims relating to events that took place after the filing of the original Complaint.  (Dkt. #29).  Taken together with the original Complaint,[10] Plaintiff seeks both injunctive relief guaranteeing his right to practice his Santeria faith in prison and monetary damages.  (Compl. 6 of 11; Am. Compl. 10 of 22).

### 2.    The Motion to Dismiss

Defendants moved to dismiss the Complaint on September 12, 2011 (Dkt. #26-27), and Plaintiff opposed that motion on October 17, 2011 (Dkt. #35).  The Court stayed the motion to dismiss to permit service of the Amended

---

[10]    In liberally construing this *pro se* Plaintiff's pleadings, the Court takes both documents together; it seems that Plaintiff intended his Amended Complaint to supplement, and not supplant, his original Complaint.

Complaint to be effected on all Defendants.  (Dkt. #36).[11]  Defendants

thereafter renewed their motion to dismiss, which motion was fully briefed on

March 9, 2012.  (Dkt. #42-43, 53-54).

On June 21, 2012, the Court issued an Order granting in part and

denying in part Defendants' motion to dismiss.  (Dkt. #71).  First, the Court

dismissed Plaintiff's claims under RFRA, as it is inapplicable to state

governments after *City of Boerne* v. *Flores*, 521 U.S. 507 (1997).  (*Id.* at 16-17).

However, the Court construed Plaintiff as raising statutory religious exercise

claims under the Religious Land Use and Institutionalized Persons Act of 2000

("RLUIPA"), Pub. L. 106-274, 114 Stat. 803, *codified at* 42 U.S.C. §§ 2000cc

through 2000cc-5, and found those claims survived any motion to dismiss.  (*Id.*

at 17).

Second, the Court concluded that it was appropriate to join Plaintiff's

claims arising from incidents at Attica with his claims arising from incidents at

Downstate and Sing Sing, even though Attica lies outside this District.  (Dkt.

#71 at 7-9).  The Court concluded that the Attica claims were "logically related"

to Plaintiff's free exercise and equal protection claims.  (*Id.* at 8).  As those

claims were properly venued in the Southern District, the Court found that the

Attica claims could be permissibly joined in this action.  (*Id.*).  Third, the Court

dismissed certain individual Defendants from this action for lack of personal

---

11      This matter, originally before the Honorable Thomas P. Griesa, United States District
        Judge for the Southern District of New York (Dkt. #5), was at that time before the
        Honorable J. Paul Oetken, United States District Judge for the Southern District of New
        York (Dkt. #32).  It was transferred to the undersigned on June 19, 2013.  (Dkt. #90).

involvement.  Finally, the Court dismissed Plaintiff's § 1983 claims for money damages against all Defendants in their official capacities; limited such claims to Defendants in their personal capacities; and allowed Plaintiff's claims for injunctive relief to stand against Defendants in their official capacities.  (*Id.* at 15-16).

### 3.    The Instant Motion

At the close of discovery, on October 25, 2013, Defendants moved for summary judgment as to all of Plaintiff's claims (Dkt. #107-113); Plaintiff opposed that motion on November 25, 2013 (Dkt. #115-120); and Defendants replied on December 11, 2013 (Dkt. #121).  On April 21, 2014, the Court ordered Defendants to provide supplementary briefing and certain additional documentary evidence by May 6, 2014, and invited Plaintiff to respond.  (Dkt. #124).  After some delays, all submissions in response to this Order were submitted by July 10, 2014.  (Dkt. #125-127, 130, 132-138).

## DISCUSSION

### A.    Applicable Law

### 1.    Summary Judgment Generally

Under Fed. R. Civ. P. 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted), and cannot rely on "mere speculation or

conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles* v. *General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)); *see also Vargas* v. *Transeau*, 514 F. Supp. 2d 439, 442 (S.D.N.Y. 2007) (observing that "the mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat summary judgment (internal quotation marks and citations omitted)), *aff'd sub nom. Vargas* v. *Pfizer, Inc.*, 352 F. App'x 458 (2d Cir. 2009) (summary order).

### 2. Summary Judgment in *Pro Se* Cases

When considering a motion for summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson* v. *Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010) (citing *LaSalle Bank Nat'l Ass'n* v. *Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005)). In a *pro se* case, the Court must go one step further and liberally construe the party's pleadings "to raise the strongest arguments that they suggest." *McPherson* v. *Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos* v. *Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

Nonetheless, a *pro se* litigant must still be held to the normal requirements of summary judgment, and "bald assertion[s]," unsupported by evidence, will not overcome a motion for summary judgment.  *See Carey* v. *Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Stinson* v. *Sheriff's Department*, 499 F. Supp. 259, 262 (S.D.N.Y. 1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").  Litigants "should be on notice from the very publication of Rule 56(e) that a party faced with a summary judgment motion may not rest upon the mere allegations or denials of the party's pleading and that if the party does not respond properly, summary judgment, if appropriate, shall be entered against him."  *Champion* v. *Artuz*, 76 F.3d 483, 485 (2d Cir. 1996) (quoting *Graham* v. *Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988) (internal quotation marks omitted)).

## B.    Analysis

### 1.    The Court Will Consider Plaintiff's Arguments Despite His Failure to Comply with Local Rule 56.1

Despite Plaintiff's failure to submit a statement pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Rules"), the Court will exercise its discretion to review the record independently in consideration of Plaintiff's arguments.  Local Rule 56.1 requires a party moving for summary judgment to submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine

issue to be tried." Local Rule 56.1(a). The movant's asserted facts are deemed to be admitted unless specifically controverted by the statement served by the opposing party. Local Rule 56.1(c).

*Pro se* litigants are "not excused from meeting the requirements of Local Rule 56.1." *Wali* v. *One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009). Even where there is incomplete compliance with the Local Rules, the Court retains discretion "to consider the substance of the plaintiff's arguments." *Id.* (citing *Holtz* v. *Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." (internal quotation marks omitted))); *see also Hayes* v. *Cnty. of Sullivan*, 853 F. Supp. 2d 400, 406 n.1 (S.D.N.Y. 2012) ("In light of Plaintiff's *pro se* status, the Court overlooks his failure to file a Local Rule 56.1 Statement and conducts its own independent review of the record.").

Defendants filed a Rule 56.1 Statement on October 15, 2013. (Dkt. #113). Plaintiff then filed a document that he labeled his "[S]tatement Pursuant to Rule 56.1 of Undisputed Material Facts." (Dkt. #115). This document, however, does not adhere to the requirements of Rule 56.1(b): it does not rebut the assertions in Defendants' Local Rule 56.1 Statement, nor does it cite evidence in support of its own assertions. Nonetheless, the Court accepts Plaintiff's statement, his opposition papers to Defendants' motion for

summary judgment, and his supporting exhibits as a statement pursuant to Rule 56.1 and a counterstatement to Defendants' 56.1 Statement.

### 2.   The Court Will Dismiss Monetary Claims Made Against Defendants Who Lack Personal Involvement

Before addressing the merits of Plaintiff's claims, the Court must resolve one other preliminary matter.  Plaintiff has not demonstrated, and the record does not support, the requisite personal involvement for Defendants Heath, Perez, Dolce, and Bradt.  As such, the Court will dismiss all monetary claims as to those defendants.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon* v. *City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted).  The Second Circuit has held that the personal involvement of a supervisory defendant may be shown by evidence that:

> [i] the defendant participated directly in the alleged constitutional violation, [ii] the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, [iii] the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, [iv] the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or [v] the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon* v. *Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[12]

"[T]he fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement." *Thomas* v. *Coombe*, No. 95 Civ. 10342 (HB), 1998 WL 391143, at *6 (S.D.N.Y. July 13, 1998). Nor is a supervisor liable under § 1983 when she receives a letter and forwards it to the appropriate staff personnel to handle, but takes no other action. *Ramos* v. *Artuz*, No. 00 Civ. 0149 (LTS) (HBP), 2001 WL 840131, at *8 (S.D.N.Y. July 25, 2001). Only "where a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint)" can the supervisor be held personally involved for § 1983 purposes. *Walker* v. *Pataro*, No. 99 Civ. 4607 (GBD) (AJP), 2002 WL 664040, at *13 (S.D.N.Y. Apr. 23, 2002) (collecting cases).

As a matter of law, the mere receipt of Plaintiff's letters by Defendants Perez and Bradt is insufficient to establish personal involvement, as is Plaintiff's cryptic and conclusory assertion that he spoke to Defendant Heath "[b]efore ... transit." (*See* Vann Dep. 56, 58-59, 75; Def. 56.1 ¶ 81). Likewise, Plaintiff's conversation with Defendant Dolce regarding his beads does not establish the latter's involvement in a constitutional violation (Vann Dep. 75),

---

[12]    The Supreme Court's decision in *Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009), "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," *Grullon*, 720 F.3d at 139. However, as the Court concludes that Plaintiff has failed to show the personal involvement of certain defendants under any standard, it need not resolve that outstanding question. *See also Doe* v. *Whidden*, 557 F. App'x 71, 72 n.1 (2d Cir. 2014) (summary order). *But see Zappulla* v. *Fischer*, No. 11 Civ. 6733 (JMF), 2013 WL 1387033, at *9 (S.D.N.Y. Apr. 5, 2013) (outlining varying judicial approaches to the *Colon* standard post-*Iqbal*).

nor, more importantly, does Plaintiff's strategic decision to name Dolce as a defendant solely "to get her testimony" (*id.* at 104).

Plaintiff might nonetheless assert that these defendants remain liable under the *Colon* standard because they "allowed the continuance" of "a policy or custom under which unconstitutional practices occurred." *Colon*, 58 F.3d at 873. Even if that standard survives *Iqbal*, Plaintiff cannot satisfy it, because he has never suggested any of these defendants was aware of what he contends is the constitutional infirmity of DOCCS policies before any of the incidents took place. Summary judgment is thus granted as to Plaintiff's monetary claims against Defendants Heath, Perez, Bradt, and Dolce. And while equitable claims against these Defendants are not procedurally foreclosed, *see Davidson* v. *Scully*, 148 F. Supp. 2d 249, 254 (S.D.N.Y. 2001), as explained at length in the remainder of this Opinion, Plaintiff's constitutional claims fail on the merits.

### 3.    Plaintiff's Free Exercise Rights Were Not Violated

Plaintiff argues that his religious rights were violated by the requirements imposed by Directive #4202 that he conceal his beads while wearing them and that he obtain approval to wear his beads while incarcerated, and by the restriction imposed by Directive #4917 that he not wear his beads while in transit. Even accepting Plaintiff's version of events, he has not identified a genuine issue of material fact.

### a.   Directive #4202 Does Not Violate the Constitution

DOCCS Directive #4202 governs the religious practices of inmates,

including the possession and use of religious beads.[13]  Concerning religious

---

[13]   On July 24, 2014, after briefing on the instant motion was fully submitted, DOCCS issued a revision of Directive #4202.  For the purposes of deciding the instant motion, the Court considers the January 18, 2008 Directive that was in place when the events at issue occurred; for this reason, it is the 2008 version that is cited in this Opinion.  As it happens, the Court cannot discern that the 2014 revision, which is striking in its vagueness, makes any substantive changes to the actual policies and procedures of DOCCS.  Rather, the revision appears to continue to require a request and approval process, as well as compliance with Departmental policies such as the Concealment Requirement discussed below.

As it concerns "other" religious beads, the January 18, 2008 version of Directive #4202 read:

> c. Other beads.
>
> (1)  An inmate may request a permit to possess and wear, but not display, religious beads, excluding Rosary and Dhikr beads, which can be documented and supported on a theological basis for use in the practice of an inmate's documented religion.  Only those colors documented and supported on a theological basis in the practice of an inmate's documented religion will be approved.  The request should be in writing to the facility Coordinating Chaplain.  Within 14 days of receipt, (1) the Coordinating Chaplain will determine the validity of the request based upon the inmate's documented religion and theological rationale and (2) the Deputy Superintendent for Security will determine if the requested beads are of such size or design that they can be used as a weapon, used to conceal contraband, or otherwise constitute any threat to the safety and security of the facility. If the request is approved, the facility will issue a special permit to the inmate and notify the Deputy Commissioner for Facility Operations.  If the facility denies the request, the inmate may appeal to Central Office by writing to the Director of Ministerial and Family Services, who will consult with the Deputy Commissioner for Correctional Facilities and issue a decision within 7 days of receipt.  If approved by Central Office, the beads will be registered at the facility and a special permit issued to the inmate which will be transferable system wide.
>
> (2)  Beads for which a special permit has been granted may be worn only underneath clothing so they are not visible.

(See First Morris Decl. Ex. A, DOCCS Directive #4202 N.2.c(1)-(2)).  The July 2014 revision reads:

beads other than rosary or dhikr beads, the Directive allows an inmate to "request a permit to possess and wear, but not display, religious beads, . . . which can be documented and supported on a theological basis for use in the practice of an inmate's documented religion."  Directive #4202 N.2.c(1).  The Directive limits the color of such beads to "[o]nly those colors documented and supported on a theological basis in the practice of an inmate's documented religion . . . ."  *Id.*  If an inmate receives a permit for beads pursuant to this directive, those beads "may be worn only underneath clothing so they are not visible."  *Id.* at N.2.c(2).  Rosary and dhikr beads, in contrast, may "be possessed in one's hands but not worn or displayed" and, even then, only in the color black.  *Id.* at N.2.b.

Inmates may separately request permits for and wear certain other specifically identified religious items, including religious pendants such as "crucifixes, crosses, pentacles, Thor's hammers, Stars of David, chais, Native American rosettes and crescents with stars and/or moons."  Directive #4202 N.2.a(1).  An authorized inmate may only wear his authorized religious pendant, like other religious beads as set out in Directive #4202 N.2.c, "underneath clothing so it is not visible," *id.* at N.2.a(2)(a), and may affix that pendant only to a metal chain or, in the case of a Native American Rosette, to a fabric or leather cord, *id.* at N.2.a(2)(b).

---

C. Other Beads: An inmate may request to possess any approved religious beads, colors and other specifications must be in compliance with Departmental policy.

DOCCS Directive #4202 XIV.C. (July 24, 2014), *available at* http://www.doccs.ny.gov/Directives/4202.pdf.

Reading Plaintiff's various submissions broadly, as the Court is obliged to do, Plaintiff lodges two distinct complaints about this directive.  First, he objects to the regulation's requirement of wearing his sacred beads entirely under his clothes so as to avoid their visibility (the "Concealment Requirement").  Second, he objects to the permit process which, on his arrival at Downstate on January 4, 2010, required him to surrender his sacred beads and wait three weeks for their return (the "Approval Process").  The Court will address these arguments in turn; neither succeeds.

### i.      Free Exercise in the Correctional Context Generally

Prison regulations ostensibly impairing the religious exercise of prisoners are assessed "'under a reasonableness test less restrictive than that ordinarily applied': a regulation that burdens a protected right passes constitutional muster 'if it is reasonably related to legitimate penological interests.'" *Salahuddin* v. *Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (quoting *O'Lone* v. *Estate of Shabazz*, 482 U.S. 342, 349 (1987)).  "[A] prisoner mounting a free-exercise challenge 'must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.'"  *Hall* v. *Ekpe*, 408 F. App'x 385, 388 (2d Cir. 2010) (summary order) (quoting *Salahuddin*, 467 F.3d at 274-75).[14]  "'The defendants then bear the relatively limited burden of

---

[14]     Whether the "substantial burden" test still applies in claims raised under the First Amendment remains an open question.  *Holland* v. *Goord*, No. 13-2694-pr, 2014 WL 3360615, at *4 (2d Cir. July 10, 2014) ("It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.'" (quoting *Salahuddin*, 467 F.3d at 274-75)).

identifying the legitimate penological interests that justify the impinging conduct.' Once defendants carry this burden of production, 'the burden remains with the prisoner to show that these articulated concerns were irrational.'" *Id.* (internal citations omitted).

A "substantial burden on religious exercise exists when an individual is required to 'choose between following the precepts of [his] religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of [his] religion ... on the other hand.'" *Westchester Day Sch.* v. *Vill. of Mamaroneck,* 504 F.3d 338, 348 (2d Cir. 2007) (quoting *Sherbert* v. *Verner,* 374 U.S. 398, 404 (1963)).

In assessing whether a given regulation is "reasonably related" to a legitimate penological interest, courts must first determine whether the challenged regulation or action "has a valid, rational connection to a legitimate governmental objective." *Salahuddin,* 467 F.3d at 274. Then courts must consider several factors: "whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means

---

It is customary in this District, absent any contrary instruction from the Second Circuit, to assume that the substantial burden test survives. *See, e.g., Washington* v. *Chaboty,* No. 09 Civ. 9199 (PGG), 2011 WL 102714, at *8 n.6 (S.D.N.Y. Jan. 10, 2011), *aff'd in part, rev'd in part on other grounds sub nom. Washington* v. *Gonyea,* 538 F. App'x 23 (2d Cir. 2013), *and aff'd in part sub nom. Washington* v. *Gonyea,* 731 F.3d 143 (2d Cir. 2013). Given the Second Circuit's recent reiteration of its reluctance to revisit this issue, the Court will adhere to the custom of this District and assume that the substantial burden test applies here.

of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests." *Id.*

### ii.    The Concealment Requirement Is Constitutionally Appropriate

The Concealment Requirement of Directive #4202 does not violate the Free Exercise Clause because it is not a burden, and certainly not a substantial one, on Plaintiff's exercise of religion; moreover, it is reasonably calculated to address the important penological interest of preventing inmate violence.  Plaintiff claims the requirement that he wear his sacred beads entirely under his clothes is a violation of his right to exercise his religion.  Undoubtedly, during his time at various correctional facilities since the beginning of 2010, Plaintiff has experienced adverse consequences occasioned by the visibility of his beads above the neckline of his shirt.  He has been reprimanded and photographed, and has undergone involuntary searches.  He has received misbehavior reports and been subjected to disciplinary action.  Still and all, Plaintiff cannot show that the Concealment Requirement "substantially burdens his sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 274.

It is undisputed that Plaintiff's beliefs are sincerely held.  It is also undisputed that wearing his sacred beads is the "main tenet" of his religious practice.  (Am. Compl. 12 of 22; Def. Br. 12).  But Plaintiff cannot demonstrate that the Concealment Requirement imposes a burden on his ability to pursue his religion.  For starters, Plaintiff has not indicated that his religion requires him to publicly display (as opposed to wear) the beads.  Moreover, Plaintiff

admits that there are reasons other than that requirement that he chooses to wear his beads under his shirt.  Plaintiff testified at his deposition that there were two reasons why he wore his beads under his shirt: first, to "keep [them] close … to the skin," and second, to keep them "away from the view of others so that [he does not] cause any type of disturbances or anything…."  (Vann Dep. 14-15).  The requirement imposed by DOCCS regulations did not even number among his rationales for doing so.  It is possible, in contradiction to Plaintiff's sworn testimony, that the requirement of concealed wear does somehow burden his religious practice.  If that were the case, however, any such burden is not a substantial one.

In the event that the Second Circuit eventually decides that the "substantial burden" test does not apply to free exercise claims (*see* n.14 *supra*), the Court will also consider whether any burden exists.  Plaintiff might argue that his anxiety over the possibility of receiving misbehavior reports and disciplinary sanctions when the beads emerge from the neckline of his clothes constitutes a burden to his religious practice.  As Plaintiff has made clear, he believes he has an unmitigated right to "wear and possess [his] beads, period." (Vann Dep. 49).  Even if the Court were to accept this remarkably broad reading of the Free Exercise Clause, however, Defendants have unmistakably demonstrated that the Concealment Requirement "has a valid, rational connection to a legitimate governmental objective,"  *Salahuddin*, 467 F.3d at 274, namely, prison security.

It is undisputed that inmates display specific colors to demonstrate alignment with gang factions within the correctional system; prohibiting the display of such colors decreases the risk of inter-faction violence. (First Kirkpatrick Decl. ¶ 6.e). Requiring inmates to keep beads concealed beneath their clothes decreases the likelihood that such beads can be used for unauthorized purposes. (*Id.*; First Morris Decl. ¶ 9). "Conduct expressly aimed at protecting prison security is 'legitimate' beyond question and is in fact 'central to all other correctional goals.'" *Shakur* v. *Selsky*, 391 F.3d 106, 113 (2d Cir. 2004) (quoting *Thornburg* v. *Abbott*, 490 U.S. 401, 415 (1989)). And the requirement of concealing sacred beads while worn is unmistakably rationally related to these two goals: inmates can still pursue their religious practice while obviating the risk that religious articles may be used, deliberately or inadvertently, to promote gang violence or for other destabilizing purposes.[15]

Not only does the Concealment Requirement seek to achieve a legitimate penological goal, but it also passes the "reasonableness" test outlined in *Salahuddin*. The first inquiry is whether inmates have "an alternative means of exercising the burdened right." *Salahuddin*, 467 F.3d at 274. Plaintiff and others similarly situated can accommodate their Santeria practice despite the requirement of concealed wear. Santeria adherents like Plaintiff can wear

---

[15]    Plaintiff argues that "plaintiff is not [displaying his beads] intentionally" (Pl. Opp. 4) and that any such display is "to no fault of the plaintiff's" (*id.* at 9). Defendants do not contest this. But the regulations do not impose liability solely for intentional violations. Nor would such a standard be sensible: given that the penological interest at issue is the prevention of inmate violence provoked by the visibility of potentially gang-affiliated colors, the visibility of Plaintiff's beads imperils that interest whether deliberate or not.

clothing with higher necklines, or simply remember to tuck in the beads periodically.  This minimal imposition on Plaintiff's time and planning cannot plausibly outweigh the significant interest secured by Directive #4202.

The next inquiry under the "reasonableness" test examines "the impact on guards, inmates, and prison resources of accommodating the right." *Salahuddin*, 467 F.3d at 274.  The impact on the corrections system of accommodating Plaintiff's desire to "wear [his] beads, period" (Vann Dep. 49), without restrictions, could be dramatic: inflamed tensions between rival factions and increased inmate violence.  (First Morris Decl. ¶ 9; First Kirkpatrick Decl. ¶ 6.e).

The final prong of the "reasonableness" test inquires whether there exists "alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests."  *Salahuddin*, 467 F.3d at 274.  In this case, there does not; indeed, the current regime is itself that alternative accommodation.

Plaintiff relies very heavily, in this litigation as well as throughout his time within the corrections system, on *Campos* v. *Coughlin*, 854 F. Supp. 194 (S.D.N.Y. 1994), apparently the only other case in this District to examine the regulations governing the wearing of Santeria beads in prison.  Contrary to Plaintiff's intimations, the decision is not precedential; more importantly, the decision only confirms the appropriateness of the directives challenged here. In *Campos*, a 1993 revision to the relevant DOCCS regulation had permitted inmates to possess religious beads but not to wear them under any

25

circumstances.  854 F. Supp. at 198-99.  Then-District Judge Sonia Sotomayor found that this regulation, prohibiting even the wearing of beads under clothing, had no rational relationship to the penological interests put forward there, which were identical to those put forward here.  *Id.* at 207-09, 211.  She also found, critically, that the regulation left Santeria practitioners with no alternative means to practice their religion, and that permitting such inmates to wear sacred beads under their clothes would have a minimal impact on the corrections system.  *Id.* at 211.

Ultimately Judge Sotomayor ruled that "the wearing of the [sacred] beads under the plaintiffs' clothing, out of sight and without intent to display them publicly, is a simple and convenient alternative to an absolute ban on wearing beads."  *Id.* at 212.  In short, what Judge Sotomayor championed is precisely what Plaintiff now decries.  The Court finds that the limitations on Plaintiff's ability to wear his beads do not offend the First Amendment because he is permitted to wear his beads pursuant to regulations that are reasonably calculated to minimize inmate violence.  More than that, the Court concludes, as *Campos* suggested, that the Concealment Requirement is the least restrictive approach DOCCS could adopt to ensure that religious items like Plaintiff's beads can be worn within correctional facilities without risking violence.  *See Campos*, 854 F. Supp. at 207-08 (holding that prohibiting inmates from wearing beads under their clothing was not the least restrictive means to advance penological interests because concealed beads would do so

with fewer burdens on inmate free exercise rights).[16]  For these reasons, the
Concealment Requirement does not violate the Free Exercise Clause.

### iv.   The Approval Process Is Not Constitutionally Impermissible

This Court further understands Plaintiff to argue that Directive #4202's
requirement that religious beads be confiscated, examined, and approved
before their introduction into the corrections system (the "Approval Process") is
also unconstitutional.  Specifically, Plaintiff argues that this procedure is
"archaic" (Pl. Opp. 10); that it "shouldn't take that long" (Vann Dep. 53); and
*Campos* should prohibit any approval process that requires the surrender, even
if temporary, of his sacred beads (*id.* at 49).  Plaintiff's challenge to the
Approval Process can be perceived either under the First Amendment, assessed
under the "reasonableness" analysis, or as a procedural due process claim,
analyzed under *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976).  It passes
muster under either analysis.

### (a)   The Process Does Not Run Afoul of the First Amendment

The Approval Process does not violate Plaintiff's free exercise rights under
the First Amendment because it is reasonably related to a legitimate
penological interest and because it satisfies the "reasonableness" test.
Forfeiting his Santeria beads altogether while facility staff conducts the

---

[16]     *Campos* was decided while RFRA's "least restrictive means" requirement was still in
effect, before the Supreme Court invalidated RFRA as to state and local governments.
The enactment of RLUIPA once again imposed the "least restrictive means" test as to
institutionalized persons.

Approval Process necessarily constitutes a substantial burden on Plaintiff's religious practice: Plaintiff regards the removal of his beads as religiously forbidden (outside certain well-defined activities, none of which is implicated here).  (Vann Dep. 122).

But even the substantial burden imposed here is justified if reasonably related to a legitimate penological interest.  *Salahuddin*, 467 F.3d at 275.  It is well settled that a "prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime," *Wolff* v. *McDonnell*, 418 U.S. 539, 555 (1974), but "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration," *Jones* v. *N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977).

Defendants have met that "relatively limited" burden, *Hall*, 408 F. App'x at 388, of demonstrating that the Approval Process serves a legitimate penological purpose.  The regulations regarding religious beads are designed to avoid inter-faction violence and limit the supply of potentially dangerous articles within correctional facilities.  (First Morris Decl. ¶ 9; First Kirkpatrick Decl. ¶¶ 6.a, 6.d, 6.e)  Pursuing these goals requires more than simply requiring inmates to keep beads concealed: the beads themselves must be inspected to ensure they do not contain contraband or pose a threat to prison staff or inmates.  *See* Directive #4202 N.c(1); First Kirkpatrick Decl. ¶¶ 6.a, 6.b. Plaintiff does not argue that requiring individual sets of ostensibly religious beads to be inspected is an irrational approach to insuring that such beads do

not impermissibly threaten prison security, nor could he plausibly make such an argument.

Analogously, courts have upheld many regulations designed to prevent the introduction of contraband into correctional facilities, even when imposing significant costs to inmate dignity.  For example, the Supreme Court has upheld prison regulations that: required strip and body cavity searches of inmates after every contact visit with individuals from outside the institution, even where such visitors were searched before the visit and the visit was conducted under continuous surveillance, *Bell* v. *Wolfish*, 441 U.S. 520 (1979); banned contact visits entirely, *Block* v. *Rutherford*, 468 U.S. 576 (1984); permitted random, suspicionless searches of inmate cells and lockers, *Hudson* v. *Palmer*, 468 U.S. 517 (1984); and even required body cavity and strip searches of individuals arrested for, but not convicted of or even charged with, minor offenses, *Florence* v. *Board of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510 (2012).  Facilities may open and inspect all incoming mail to inmates.  *Word* v. *Croce*, 169 F. Supp. 2d 219, 228 (S.D.N.Y. 2001) ("legitimate security and penological interests have been held to outweigh a prisoner's interest in mail'" (quoting *Cruz* v. *Jackson*, No. 94 Civ. 2600 (RWS), 1997 WL 45348, at *9 (S.D.N.Y. Feb. 5, 1997))).  Corrections officers may reject certain items sent through the mail (such as blank greeting cards) when they pose identified risks to prison security, even in the face of First Amendment freedom of expression challenges.  *Sadler* v. *Lantz*, No. 07 Civ. 1316 (CFD), 2011 WL 4561189, at *5-7 (D. Conn. Sept. 30, 2011).  Accordingly, it is perfectly rational

for DOCCS policy to require a period of time to inspect putatively religious articles and verify that they pose no threat to the correctional environment.

So much established, the Court turns to the "reasonableness" test.  First, the Court considers "whether prisoners have alternative means of exercising the burdened right."  *Salahuddin*, 467 F.3d at 274.  This first inquiry weighs heavily against Defendants: while Plaintiff's sacred beads were undergoing inspection, he had no alternative means of religious practice whatsoever, a deprivation he found extremely distressing and even, he claims, deleterious to his physical health.  (Vann Dep. 53-55).

The second inquiry, however — "the impact on guards, inmates, and prison resources of accommodating the right," *Salahuddin*, 467 F.3d at 274 — weighs heavily in favor of Defendants: the cost of accommodating Plaintiff's religious exercise during this period would be significant.  The integrity of the facility's security would be undermined each time an inmate sought approval for ostensibly religious beads, and while the Approval Process was unfolding the facility's staff and inmate population would be at risk of increased violence prompted by or committed using such beads or contraband concealed within them.

Third, there are no obvious "alternative means," *Salahuddin*, 467 F.3d at 274, by which DOCCS could accomplish its identified goals without requiring Plaintiff to surrender his beads for some length of time.  If an inmate is wearing his beads, conducting a firsthand inspection would be impractical and likely ineffectual.  And of course, if ostensibly religious beads actually contained

30

contraband, their introduction into the inmate population before inspection would render any such subsequent inspection, no matter how accomplished, entirely pointless.

Plaintiff might justifiably point to the fact that inmates are permitted to wear certain religious articles like crucifixes mounted on metal chains without undergoing the Approval Process, and argue that allowing him the same liberty would necessarily constitute a less restrictive means of protecting prison security. Such an accommodation, however, would misperceive the rationale informing the Approval Process itself. In the judgment of DOCCS personnel, beads like Plaintiff's pose distinctive risks of concealing contraband and provoking violence via display of colors associated with particular inmate factions — risks different from and more severe than those posed by the thin chain suspending a crucifix. (First Kirkpatrick Decl. ¶¶ 6.a, 6.b, 6.e; First Morris Decl. ¶ 9). And courts must "accord prison administrators 'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security,'" *Cabral* v. *Strada*, 513 F. App'x 99, 101 (2d Cir. 2013) (summary order) (quoting *Wolfish*, 441 U.S. at 547), even in the context of claimed infringement on sincere religious belief, *Jolly* v. *Coughlin*, 76 F.3d 468, 476 (2d Cir. 1996).

Plaintiff has offered no basis for the Court to conclude that DOCCS' judgment regarding the appropriate precautions required for different categories of religious items does not deserve that deference. Nor, without

more, can Plaintiff prevail simply by asserting that it "shouldn't take that long" (Vann Dep. 53) for prison staff to conduct the Approval Process.  The Court will not interrogate the professional assessment of prison personnel as to how rigorous and extensive the Process must be.  (*See* First Kirkpatrick Decl. ¶¶ 6.a, 6.b (discussing the requirements for fully examining beaded necklaces to ensure they do not threaten prison security)).

In sum, the Approval Process is the least restrictive infringement on inmates' religious rights available, and so necessarily does not impose on inmates' religious practice more than is permitted by law.  The Court does not, by coming to this conclusion, in any way denigrate the sincerity of Plaintiff's beliefs or the significance of even a temporary government-mandated interruption in his religious practice.  But the burden imposed by this regulation, though significant, does not go further than is required to protect prison inmates and personnel and so it necessarily does not offend the Constitution.

### (b)    Plaintiff Was Afforded Procedural Due Process

The Court also construes Plaintiff's submissions as mounting a procedural due process attack on the Approval Process under the Fourteenth Amendment, based on the deprivation of his sacred beads after they were confiscated for inspection and approval at Downstate.  This claim also fails.  Case law suggests that several arguments are available to Plaintiff on these facts; he could argue that the Approval Process: (i) is "unevenhanded," as in *Campos*; (ii) is designed not for a genuine interest, but for the central

administration to gain better control over facility staff, as in *Campos*; or

(iii) deprives Plaintiff of an adequate "opportunity to be heard," under the

*Mathews* factors.

In *Campos*, Judge Sotomayor considered the DOCCS process at issue in

that case under the framework set out in *Mathews* v. *Eldridge*, 424 U.S. 319

(1976), to assess "'whether the plaintiff was deprived of a protected interest,

and, if so what process [the plaintiff] was due.'" *Campos*, 854 F. Supp. at 212

(quoting *Farid* v. *Smith*, 850 F.2d 917, 924 (2d Cir. 1988) (alteration in

*Campos*)).  *Mathews* instructs that courts should examine three factors in

assessing claims of unwarranted deprivations:

> First, the private interest that will be affected by the
> official action; second, the risk of an erroneous
> deprivation of such interest through the procedures
> used, and the probable value, if any, of additional or
> substitute procedural safeguards; and finally, the
> Government's interest, including the function involved
> and the fiscal and administrative burdens that the
> additional or substitute procedural requirement would
> entail.

424 U.S. at 335.  She concluded that the plaintiffs in *Campos* had an

unmistakable free exercise interest that would be impaired by the temporary

confiscation of their sacred beads during the approval process at issue; that

there was "more than an opportunity of erroneous deprivation in that there has

been an actual deprivation … even after local prison administrators recognized

the sincerity of plaintiffs' religious beliefs"; and that there would be no

additional burdens whatsoever to permitting individuals to continue wearing

their beads while the approval process was ongoing.  *Campos*, 854 F. Supp. at

212.  This was because, Judge Sotomayor explained, the approval process implicated by her case was designed "to properly establish the religious nature of plaintiffs' requests … [and] to assess the genuine nature of their religious beliefs with respect to the use of beads."  *Id.*  Given that "only Santeria adherents" were required to seek approval for the use of their beads and to forfeit their religious items during the approval process, the approval process was clearly unevenhanded.  *Id.*  Finally, the process required both the facility and the Central Office at Albany to sign off on a particular set of beads before approval would be granted; defendants admitted this procedure was intended to enable central DOCCS administration to gain better control over facility staff, and not to pursue a genuine interest in identifying sincere religious practitioners.  *Id.* at 212-13.

*Campos* is plainly distinguishable from the instant case.  First, unlike in *Campos*, Directive #4202's Approval Process is not "unevenhanded."  *Campos*, 854 F. Supp. at 212.  All religious jewelry, including more "traditional" religious pendants like crucifixes, must "be consistent with [the inmate's] documented religion."  Directive #4202 N.2.  Nor does this process put corrections personnel in the problematic position of interrogating inmates to confirm their commitment to a religion; the question is only whether a given religious article aligns with the religious identity an inmate has declared, either on his entry into the DOCCS system (First Morris Decl. ¶ 7), or after changing his religious affiliation during incarceration (*id.* Ex. A 12).

34

Also unlike in *Campos*, Directive #4202's Approval Process serves a legitimate government interest. It was designed not to ensure the religious sincerity of inmates seeking to wear specific religious articles, but rather to protect prison security by ensuring that beads entering a facility are indeed religious articles and pose no threat to the facility, its staff, or the inmate population. The latter is an indisputably great government interest. Nor is the Approval Process principally designed to assert uniform DOCCS standards regarding religious articles in the face of varying facility-by-facility practice, a flaw that doomed the process *Campos* examined. The only involvement of the Central Office here is to provide a remedy for incorrect facility determinations, not a mandatory approval mechanism for each reviewed item. Put simply, *Campos* is not on point.

Applying the *Mathews* analysis directly to the challenged process itself counsels for upholding the Approval Process as an adequate provision of due process. An inmate has an "opportunity to be heard," *Mathews*, 424 U.S. at 333, as he may file a written statement both in the first instance at the facility and at the Central Office review level.[17] *See Hewitt* v. *Helms*, 459 U.S. 460, 476 (1983) (holding that "[o]rdinarily a written statement by the inmate" will suffice, even in hearings regarding the imposition of increased restraints on personal liberty during incarceration), *methodology receded from, Sandin* v.

---

[17]    It is worth noting that the brief deprivation of which Plaintiff principally complains here, arising from the January 4, 2010 incident at Downstate, was resolved in his favor without any effort on his part. On his account, he arrived at Downstate, surrendered his beads for inspection, and had them returned with a permit for him to sign, all without his involvement. (Vann Dep. 46-49).

*Conner*, 515 U.S. 472 (1995); *see also Gittens* v. *Lefevre*, 891 F.2d 38, 41 (2d Cir. 1989) (finding inadequate a prison policy of confining prisoners pending disciplinary hearings because "no provision [was] made for an inmate to file any statement, written or oral"); *Batista* v. *Kelly*, 854 F. Supp. 186, 192 (W.D.N.Y. 1994) (concluding that new regulations providing inmates with "the right to make a written statement prior to the hearing" cured the procedural infirmity identified in *Gittens*), *aff'd*, 50 F.3d 2 (2d Cir. 1995).  Whether that opportunity to be heard is adequate depends, as always, on balancing the *Mathews* factors.

Plaintiff has an important private interest under the First Amendment in retaining his sacred beads — wearing them is a vital element of his religious practice.  *See Cruz* v. *Beto*, 405 U.S. 319 (1972) (holding that inmates retain religious rights).  But the risk of an erroneous deprivation is extremely low: step one of the Approval Process inquires whether the item is a genuine religious article given the inmate's own identification of his religious identity; step two ensures that the item poses no hidden threat to prison security. Assuming that the beads in question are what they purport to be, a Santeria practitioner like Plaintiff faces no significant risk of erroneous deprivation of his sacred beads beyond the time necessary for the Approval Process itself.

Next, there are no appropriate alternative safeguards, given the animating purpose of the Approval Process, that could better secure the property rights of inmates like Plaintiff who seek to wear religious beads.  In *Campos*, the stated purpose of the regulation at issue was to determine

whether an individual inmate's claim of religious practice involving a specific set of sacred beads was authentic.  Given that aim, there was an obvious alternative: permitting inmates to continue wearing beads, concealed, while the approval process unfolded.  *Campos*, 854 F. Supp. at 212.  The Approval Process at issue here, however, has a fundamentally different rationale: protecting the safety of the correctional environment.  "Given 'the necessity for quick action ... or the impracticality of providing any predeprivation process' in such circumstances," there simply is no appropriate set of alternative procedural safeguards.  *Diaz* v. *Coughlin*, 909 F. Supp. 146, 150 (S.D.N.Y. 1995) (quoting *Parratt* v. *Taylor*, 451 U.S. 527, 539 (1981), *overruled in part on other grounds*, *Daniels* v. *Williams*, 474 U.S. 327 (1986)).  Directive #4202 provides both for expedient evaluation of the status of the beads and for swift appeal of adverse decisions.  And under Directive #4202, more than one remedy is available to an inmate frustrated with a denial of his application; both the inmate grievance process, *see Diaz*, 909 F. Supp. at 150, and state court Article 78 proceedings, *see Chalif* v. *Artus*, No. 03 Civ. 0713 (GTS) (DRH), 2009 WL 4263467, at *2 n.6 (N.D.N.Y. Nov. 24, 2009), allow inmates to challenge property deprivations.  *See Spinelli* v. *City of New York*, 579 F.3d 160, 175 (2d Cir. 2009) (holding that exigent circumstances could justify failing to provide pre-deprivation process, but not post-deprivation process).

The state's interests here are weighty: ensuring that no dangerous or fraudulent items enter a correctional facility, and preventing possible inter-faction violence or other unauthorized uses of an ostensible set of sacred

beads.  Protecting prison security is "central to all other correctional goals,"

*Shakur*, 391 F.3d at 113, and a government interest of incontestably great

moment.  As the Supreme Court has instructed,

> "[C]ourts are ill equipped to deal with the increasingly
> urgent problems of prison administration and reform.
> Judicial recognition of that fact reflects no more than a
> healthy sense of realism. Moreover, where state penal
> institutions are involved, federal courts have a further
> reason for deference to the appropriate prison
> authorities."

*Jones*, 433 U.S. at 126 (quoting *Procunier* v. *Martinez*, 416 U.S. 396, 405

(1974)).

Despite the threat to security represented by items like Plaintiff's beads,

the Approval Process outlined in Directive #4202 ensures that inmates have

the benefit of substantial procedural safeguards for their property rights.  It

represents the most appropriate balance of the rights of inmates with the

critically important objective of protecting prison security.  There is no doubt,

as acknowledged above, that Plaintiff regards this deprivation as a severe

infringement on his rights.  But in the prison context "federal courts ought to

afford appropriate deference and flexibility to state officials trying to manage a

volatile environment."  *Sandin* v. *Conner*, 515 U.S. 472, 482 (1995).  The

Approval Process does not violate Plaintiff's right to procedural due process.

### b.   Directive #4202 Does Not Violate RLUIPA

The Court has previously construed Plaintiff as raising claims under

RLUIPA.  (Dkt. #71 at 17).  As set forth in the remainder of this subsection,

Directive #4202 does not violate this statute any more than it violates the First Amendment.

### i.      RLUIPA Generally

"Under RLUIPA, a plaintiff must demonstrate that the state has imposed a substantial burden on the exercise of his religion; however, the state may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest." *Redd* v. *Wright*, 597 F.3d 532, 536 (2d Cir. 2010) (citing 42 U.S.C. § 2000cc-1(a)).

RLUIPA does not afford a plaintiff a cause of action for money damages against individual defendants in either their official capacities, *Sossamon* v. *Texas*, 131 S. Ct. 1651, 1663 (2011), or their individual capacities, *Washington* v. *Gonyea*, 731 F.3d 143, 145 (2d Cir. 2013).  Plaintiffs may, however, seek injunctive relief against officials in their official capacities.  *See Sossamon*, 131 S. Ct. at 1658 (holding that "a waiver of sovereign immunity to other types of relief does not waive immunity to damages"); *id.* at 1666 (Sotomayor, J., dissenting) (observing that "the majority appears to accept that equitable relief is available to RLUIPA plaintiffs"); *see also Goode* v. *Bruno*, No. 10 Civ. 1734 (SRU), 2013 WL 5448442, at *7 (D. Conn. Sept. 30, 2013) (permitting a RLUIPA claim for injunctive relief to continue past summary judgment).

### ii.      Applying RLUIPA to Directive #4202

The Court has already concluded that the Concealment Requirement does not substantially burden Plaintiff's religious rights and, even if so, is the

least restrictive means by which DOCCS may pursue the compelling interest of avoiding violence among inmates.  The Court has also concluded that the Approval Process, while indisputably burdening Plaintiff's religious exercise, is also the least restrictive means to advance the compelling interests of preventing the introduction of contraband into correctional facilities and attendant inmate violence.  These conclusions suffice also to rebuff Plaintiff's RLUIPA challenge to Directive #4202.

### c.   Directive #4917 Does Not Violate the Constitution

Plaintiff also challenges Directive #4917 (the "Transit Ban") based on the September 27, 2010 incident during his transit from Sing Sing to Attica.  Many of his claims echo those raised as to Directive #4202.  For analogous reasons, his claims as to Directive #4917 fail as well.

Under the Transit Ban, inmates may only wear a specific set of items while in transit between facilities, including: a wedding band, a handkerchief, prescription eye glasses, approved religious head coverings, false teeth, and hearing aids.  Directive #4917 III.B.3.  Additionally, Jewish inmates may wear tallit katans and Native American inmates may wear Native American medicine bags; in both cases, these items must be completely concealed beneath their clothing.  This policy is designed to ensure safety in transit by controlling unauthorized items that might be used as weapons against personnel or inmates.  (First Kirkpatrick Decl. ¶ 4).

### i.   Applying the First Amendment to the Transit Ban

As noted, Plaintiff was not permitted to wear his beads when he was transferred from Sing Sing to Attica on September 27, 2010.  (First Morris Decl. ¶ 13).  A corrections officer removed the beads, using gloves, placed them in an envelope, and returned the envelope to Plaintiff to carry during transit.  (Vann Dep. 60).[18]

Directive #4917 does not violate the First Amendment.  Just as with the Approval Process under Directive #4202, the Transit Ban under Directive #4917 imposes a substantial burden on Plaintiff's religious practice.  When Plaintiff was transferred from one facility to another, he was compelled to remove his beads, violating the central tenet of his religious practice.

Plaintiff does not contest, and could not credibly do so, that there is a legitimate penological purpose in preventing violence during inmate transit, a period of heightened risk to corrections personnel and other inmates from the increased likelihood of efforts at escape.  (First Kirkpatrick Decl. ¶ 4).  Thus the question is whether preventing inmates from wearing unapproved items is reasonably related to this obviously important goal.  *Salahuddin*, 467 F.3d at 274.  The Court concludes that it is.  Inmate transit is a highly controlled

---

[18]    At first blush, there appears to be a conflict in the record about the availability of permits allowing inmates to wear religious articles other than those specifically identified in Directive #4917 during transit.  Plaintiff and a DOCCS representative both believed for a time that DOCCS issued such permits.  (Pl. Opp. Ex. A (Dkt. #120) 43 of 87; First Morris Decl. ¶¶ 12-13).  This belief, however, stems from a misunderstanding of a now-suspended DOCCS practice regarding "local permits" for religious items. (Second Kirkpatrick Decl. ¶¶ 13-14).  A searching review of the record confirms that inmates were never permitted to wear items such as Santeria beads "during a transport away from the security of a correctional facility."  (*Id.* at ¶ 17).

environment in which prisoner freedom is at an absolute minimum to guarantee the safety of all the individuals involved and maximize control of corrections personnel over the transit environment.  (First Kirkpatrick Decl. ¶ 4).  Inmates in transit forfeit custody and control over all their personal possessions, which are bagged and delivered separately; they also face extremely strict and specific limits on the number and variety of items they may transfer from one facility to another via DOCCS transportation, and must either ship or abandon any property in excess of those limits.  *See generally* Directive #4917 III.  Accommodating the right in question — construed here as the right to wear unapproved religious items during transit — would come at a very high cost, as it would introduce sources of significant unpredictability and potential risk into a highly unstable and dangerous environment.

No plausible alternatives to the Transit Ban could solve the problem of danger during inmate transit.  Plaintiff has not disputed that religious beads such as his pose a potential threat in the transit environment.  And Colonel Michael Kirkpatrick, the Director of the DOCCS Correction Emergency Response Team, explained that no means existed to mitigate the risks posed by religious beads such as Plaintiff's during inmate transit.  (Second Kirkpatrick Decl. ¶ 17).  Nor could Plaintiff argue that the different treatment accorded certain other religious items bolsters his position or undercuts Defendants'. Such an argument would overlook the meaningful differences between an article such as Plaintiff's sacred beads and the religious articles presumptively approved for wear during transit.  The only religious articles Directive #4917

42

permits in transit are very specific religious or cultural garments like the tallit or the kufi.  Directive #4917 III.B.3.  Notably, inmates are not permitted to wear religious jewelry or accessories, such as crucifixes, Stars of David, or pentacles during transit.  Excluding items of this type embodies a correctional judgment that they represent, as a category, a source of elevated risk and instability in the transit environment: a length of beads or metal chain poses more threat of violence than a cloth head covering.  (First Kirkpatrick Decl. ¶¶ 6.a-6.e).  Permitting inmates to wear items falling into this category would ignore those risks and jeopardize inmate and personnel safety.  (Second Kirkpatrick Decl. ¶ 17).

The Transit Ban is a reasonable solution to advancing the vital penological interest at issue.  Even where, as here, an inmate suffers a substantial religious burden by having to remove an item the wearing of which he regards as a religious obligation, the consequent costs are more than justified by the benefits for other inmates and corrections personnel.  The Transit Ban is also, as far as the Court can tell, the least restrictive approach to balancing inmate rights with safety concerns during inter-facility transfers.

### d.    Directive #4917 Does Not Violate RLUIPA

The Transit Ban unmistakably creates a substantial burden to inmate free exercise rights.  But the Court has already concluded that the Transit Ban is the least restrictive means by which DOCCS could advance the penological interest of ensuring safety during transit.  As discussed at length above, any other approach would substantially increase the risk to inmates and prison

43

personnel.  As the least restrictive means by which DOCCS could solve the

problem of transit, Directive #4917 does not violate RLUIPA and Plaintiff may

not obtain an injunction against its enforcement.[19]

### 4.    Plaintiff's Right to Equal Protection Was Not Violated

Separately, the Court understands Plaintiff to raise two different classes

of equal protection challenges.  The first is that Directives #4202 and #4917, as

drafted, impose heavier burdens on Plaintiff than on adherent of other religions

by subjecting him to requirements others do not face, specifically, the Approval

Process and the Transit Ban.  The second is that corrections officers selectively

enforced the Concealment Requirement to impose an unequal burden on

Plaintiff: other inmates were not punished, he claims, when their religious

articles inadvertently became visible, while he routinely attracted negative

attention and disciplinary action when his beads came into view above the

neckline of his clothes.  Neither of these claims states an equal protection

violation.

### a.    Equal Protection Generally

The Equal Protection Clause of the Fourteenth Amendment provides that

"[n]o State shall ... deny to any person within its jurisdiction the equal

protection of the laws."  U.S. Const. amend. XIV.  The Supreme Court has

explained that the clause embodies "a direction that all persons similarly

---

[19]      As noted above, RLUIPA does not permit plaintiffs to seek money damages.

situated should be treated alike." *City of Cleburne* v. *Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).

To attack the content of a government policy as violating the Equal Protection Clause, "claimants must prove purposeful discrimination, directed at an identifiable or suspect class." *Giano* v. *Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (internal citations omitted).  Alternatively, to win a claim of selective enforcement, a plaintiff must prove "that he was intentionally treated differently from other similarly situated individuals; ... and that the disparate treatment was either (a) irrational and wholly arbitrary or (b) motivated by animus." *Kellogg* v. *New York State Dep't of Corr. Servs.*, No. 07 Civ. 2804 (BSJ) (GWG), 2009 WL 2058560, at *3 (S.D.N.Y. July 15, 2009).  The Second Circuit has expanded on this latter test, explaining that a plaintiff must prove that "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Neilson* v. *D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005), *overruled on other grounds by Appel* v. *Spiridon*, 531 F.3d 138 (2d Cir. 2008).  "In such a 'class of one' case, the existence of persons in similar circumstances who received more favorable treatment than the plaintiff is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose — whether

45

personal or otherwise — is all but certain." *Id.* (citing *Vill. of Willowbrook* v. *Olech*, 528 U.S. 562, 565 (2000)).

"As a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury." *Harlen Associates* v. *Inc. Vill. of Mineola*, 273 F.3d 494, 501 n.2 (2d Cir. 2001). "This rule is not absolute, however, and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Id.* (citing *Cruz* v. *Coach Stores*, 202 F.3d 560, 568 (2d Cir. 2000)).

The Second Circuit has ruled that the "reasonableness" First Amendment standard for prisoner free exercise claims also applies to prisoner equal protection claims. *See Benjamin* v. *Coughlin*, 905 F.2d 571, 575 (2d Cir. 1990); *Pugh* v. *Goord*, 571 F. Supp. 2d 477, 502 (S.D.N.Y. 2008). "Thus, even if plaintiffs can demonstrate that two groups are similarly situated, disparate treatment may still be warranted if the government can demonstrate that the distinctions are 'reasonably related to legitimate penological interests.'" *Pugh*, 571 F. Supp. 2d at 502 (quoting *Benjamin*, 905 F.2d at 574)).

### b. The DOCCS Directives Do Not Violate the Equal Protection Clause

Turning first to his claims under Directive #4202, Plaintiff cannot successfully argue that the Approval Process violates the Equal Protection Clause. It is true that the Approval Process imposes different requirements on inmates who wear certain religious items, such as crucifixes, that are not on the approved list; the chain may be visible, but the pendant must be kept

46

concealed.  But Plaintiff is simply not similarly situated to such inmates.  The metal chain required for pendants like crucifixes, *see* Directive #4202 N.2.a(2)(b), does not pose the same risks to prison security as the colors painted on Plaintiff's sacred beads.  (First Morris Decl. ¶ 9; First Kirkpatrick Decl. ¶ 6.e).  In particular, compared to a thin chain, beads like Plaintiff's pose a higher risk both of concealing contraband and of displaying colors to signify gang membership.  (First Kirkpatrick Decl. ¶¶ 6.a-6.e).  Plaintiff does not dispute that wearing identifying colors provides a device by which inmates can seek to undermine prison security.  (Vann Dep. 14-15 (admitting he prefers wearing his beads concealed to keep them "away from the view of others so that [he did not] cause any type of disturbances or anything....")).  A nondescript chain supporting a religious pendant does not pose the same risk.  Plaintiff is not similarly situated with the prisoners whose different treatment under the Approval Requirement prompts his complaint here.

Even if Plaintiff were somehow similarly situated with inmates whose religious articles did not face the Approval Process imposed by Directive #4202, the directive still survives Equal Protection scrutiny.  As the Court has already determined, the Approval Process is (i) reasonably related to the legitimate penological purpose of ensuring prison security and (ii) the least restrictive means of advancing this goal.  For precisely these reasons, the Approval Process satisfies the reasonableness analysis appropriate under the Equal Protection Clause.

The Transit Ban of Directive #4917 is no different.  Plaintiff claims that only "non-traditional religious practices" suffer from burdens imposed by the Transit Ban.  (Pl. Opp. 8).  But that simply is not true: no religious jewelry, including crucifixes, Stars of David, or pentacles, is pre-approved for inmate wear during transit.  All inmates wearing such items face the same constitutional burden as did Plaintiff.  These inmates are not similarly situated with those inmates whose religious or cultural garments are pre-approved for transit wear: a length of chain or of beads is simply different, from the perspective of ensuring safety during the potentially volatile inmate transit process, than a tallit or a kufi.

Finally, the Transit Ban also withstands Plaintiff's Equal Protection challenge because it is rationally related to ensuring inmate and personnel safety during transit.  Indeed, the Court has held that the Transit Ban, like the Approval Process and the Concealment Requirement, is the least restrictive means by which DOCCS could pursue this vital end.

### c. Plaintiff Was Not the Victim of Selective Enforcement

The Court also construes Plaintiff to argue the Concealment Requirement was selectively enforced against him.  (*See* Vann Dep. 64 ("I couldn't help the way my beads show behind my neck line....  It's as if I'm wearing a gold chain with a cross pendant."); *id.* at 80 ("[O]ther practitioners of other religions wear their chains and ... their chains show...."); *see also* Pl. Opp. 16 ("In other situations, pendants are worn by practitioners of other faiths of choice, that are traditional, and those practitioners aren't harassed, or written misbehavior

48

reports.  Even though their necklaces are visible at their neckline, why is

that?")).  Plaintiff's frustration, however, does not constitute an Equal

Protection violation.  First, Directive #4202 does not require the chain of a

religious pendant to be concealed: only the pendant itself is required to "hang

underneath clothing so it is not visible."  *Id.* at N.2.a(1)(a).  Beads like

Plaintiff's, in contrast, are treated as a single unit and required to be concealed

in their entirety.  *Id.* at N.2.c(2).  What Plaintiff perceives as selective

enforcement is actually a straightforward application of the regulations as

written.

Nor does the differing treatment manifest in the Concealment

Requirement itself constitute an Equal Protection violation.  As Plaintiff himself

acknowledged (Vann Dep. 14-15), his colored sacred beads pose a distinctive

threat to the correctional environment, one not posed by black rosary or dhikr

beads[20] or by the metal or leather used to suspend religious pendants.  Thus,

neither the enforcement nor the content of the Concealment Requirement

offends the Equal Protection Clause.  More fundamentally, Plaintiff has failed

to identify a genuine issue of material fact concerning the constitutionality of

Directives #4202 and #4917.[21]

---

[20]  Regulations require rosary and dhikr beads to be entirely black.  Directive #4202 N.2.b.

[21]  Even were the Court to have found a constitutional violation in one of the challenged
DOCCS directives, Defendants would have qualified immunity from monetary damages
in their individual capacities. "Qualified immunity protects government officials from
liability where the officials' conduct was not in violation of a clearly established
constitutional right."  *Sudler* v. *City of New York*, 689 F.3d 159, 174 (2d Cir. 2012)
(internal quotation marks omitted), *cert. denied*, 133 S. Ct. 2777 (2013).  Qualified
immunity is an affirmative defense and defendants asserting it bear the burden of proof.
*See Lore* v. *City of Syracuse*, 670 F.3d 127, 149 (2d Cir. 2012).  "If the conduct did not
violate a clearly established constitutional right, or if it was objectively reasonable for

### 5. Plaintiff May Not Maintain His Claims Arising from Incidents at Attica in This Action

#### a. Plaintiff Failed to Exhaust Administrative Remedies Relating to Each Incident

##### i. Exhaustion Generally

The Prisoner Litigation Reform Act of 1995 ("PLRA"), Pub. L. No. 104-134, Title VIII, 110 Stat. 1321-71 (1996), *codified as amended at* 42 U.S.C. § 1997e, provides that "[n]o action shall be brought with respect to prison conditions under section 1983 ..., or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter* v. *Nussle*, 534 U.S. 516, 532 (2002).  This means that prisoners must "make full use of the prison grievance process" available to them, *Woodford* v. *Ngo*, 548 U.S. 81, 94 (2006), irrespective of the form of relief they seek, *Booth* v. *Churner*, 532 U.S. 731, 741 (2001).

---

the [official] to believe that his conduct did not violate such a right, then the [official] is protected by qualified immunity.'"  *Doninger* v. *Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011) (quoting *Gilles* v. *Repicky*, 511 F.3d 239, 244 (2d Cir. 2007)) (alterations in *Doninger*).

The instant record discloses no evidence of violation of a clearly established constitutional right.  Even if *Campos* were precedential, which it is not, it is clear that DOCCS revised the directives to address precisely the infirmities that then-Judge Sotomayor identified in that decision.  Similarly, given the many judicially approved regulations designed (i) to protect the correctional environment from contraband and (ii) to safeguard inmates and prison personnel, defendants could not have been on clear notice that Plaintiff had an unfettered right to "wear and possess [his] beads, period." (Vann Dep. 49).

New York State DOCCS requires inmates to pursue three levels of review for grievances to obtain proper exhaustion: they must file a grievance with the Inmate Grievance Resolution Committee ("IGRC") in their facility; appeal an adverse IGRC decision to the superintendent of the facility; and appeal an adverse superintendent decision to the Central Office Review Committee ("CORC").  N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5.  "Only after the CORC has denied an appeal may the inmate bring the matter into federal court."  *Martinez* v. *Ravikumar*, 536 F. Supp. 2d 369, 371 (S.D.N.Y. 2008).

### ii.   Plaintiff Failed to Exhaust

Plaintiff did not exhaust his administrative remedies with respect to any of the incidents at Attica prior to filing a complaint regarding that incident in federal court.  Thus his claims must be dismissed.

Plaintiff complained of two incidents at Attica in the original Complaint he filed on March 17, 2011.  Irrespective of Plaintiff's confusion over dates, the first incident in fact took place on November 30, 2010.  Plaintiff obtained a final adverse determination from CORC regarding that incident on March 30, 2011.  (Pl. Opp. Ex. B (Dkt. #120-1) 32 of 51).  The second incident took place on March 12, 2011.  He obtained a final adverse determination from CORC on July 6, 2011.  (*Id.* (Dkt. #120) at 79 of 87).  Plaintiff filed the Complaint in this action before exhausting the grievance process with respect to either claim and so he is barred from litigating them here.  *See Woodford*, 548 U.S. at 94 (holding that administrative remedies must be fully exhausted before bringing a suit); *see also Neal* v. *Goord*, 267 F.3d 116, 123 (2d Cir. 2001) (affirming

dismissal for failure to exhaust when a plaintiff received a CORC response after filing the complaint), *overruled on other grounds*, *Porter* v. *Nussle*, 534 U.S. 516 (2002).

Plaintiff subsequently filed an Amended Complaint on August 30, 2011. The timing of this amended pleading introduces two complexities into the exhaustion analysis.  The first is whether Plaintiff can be considered to have exhausted his administrative remedies under the PLRA as it concerns the November 2010 and March 2011 incidents.  At the time the Amended Complaint was filed, Plaintiff had received final determinations from CORC on those grievances.  "'[I]t is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect.'" *Pagan* v. *New York State Div. of Parole*, No. 98 Civ. 5840 (FM), 2002 WL 398682, at *4 (S.D.N.Y. Mar. 13, 2002) (quoting *Harris* v. *City of New York*, 186 F.3d 243, 249 (2d Cir. 1999)).  However, a claim in an amended pleading that "asserts a claim ... that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading" is regarded as relating back to the original complaint; that is, a claim in an amended complaint that functionally duplicates a claim in an original pleading is regarded as having been brought at the time of that original pleading.  Fed. R. Civ. P. 15(c)(1)(B). To the extent that the Amended Complaint restates Plaintiff's allegations from the original Complaint regarding the November 2010 and March 2011 incidents, those claims were "brought" for the purposes of the PLRA when the

original Complaint was filed on March 17, 2011.  Thus both claims remain barred for failure to exhaust despite Plaintiff's Amended Complaint.

The second complexity the Amended Complaint introduced was new allegations regarding the June 29, 2011 and July 26, 2011 incidents.  These incidents do not relate back to the original Complaint because they did not arise from the same "conduct, transaction, or occurrence" as stated in the original Complaint.  Fed. R. Civ. P. 15(c)(1)(B).  Though related, these incidents occurred at different times and with different motivations.  Indeed, Plaintiff concedes that these summer 2011 incidents were motivated not by alleged animus towards Plaintiff's religious practice, but rather by a desire to retaliate against Plaintiff for bringing this lawsuit.  (Vann Dep. 77-78, 115-16).[22]  Thus, contrary to Defendants' argument, just because the later incidents "post-date the bringing of this action" does not require that Plaintiff's claims arising from those incidents be dismissed.  (Def. Br. 15).  *Cf. Shariff* v. *Coombe*, 655 F. Supp. 2d 274, 284 (S.D.N.Y. 2009) (examining an amended complaint filed after the effective date of the PLRA that introduced some new claims while re-pleading claims raised in the original complaint filed before the PLRA became effective, and ruling that the new claims did not relate back to the original complaint and so were subject to the PLRA's exhaustion requirement, while the original claims were not).

---

[22]   Conversely, the earlier incidents, both of which took place before the original Complaint was filed, could not possibly have been motivated by an intent to retaliate against Plaintiff for bringing this lawsuit.

Nonetheless, Plaintiff also failed to exhaust his administrative remedies with respect to these new incidents included in the Amended Complaint. Accordingly, he is barred from bringing them in this action.  The third Attica incident took place on June 29, 2011.  Plaintiff received an adverse decision from the superintendent regarding his grievance on December 5, 2011.  (Pl. Opp. Ex. B (Dkt. #120) 63 of 87).  Plaintiff did not seek an appeal from the superintendent's judgment, meaning Plaintiff never exhausted his administrative remedies.  (*Id.*).  Even if he ultimately did so, he did not do so before filing the Amended Complaint.

The final Attica incident took place on July 26, 2011.  Plaintiff did not apparently file a formal grievance regarding this search incident, instead choosing to write a letter of complaint directly to the superintendent.  (Pl. Opp. Ex. B (Dkt. #120) 81 of 87).  He received a memorandum in response to that letter on August 28, 2011, from an Attica captain, advising that in the facility's judgment, "there was no evidence to support [Plaintiff's] allegation" of an improper search.  (*Id.* at 84 of 87).  Plaintiff never began the formal grievance process with respect to this incident.  Even were the letter from the superintendent to be construed as a response to a grievance as contemplated by the DOCCS regulations, Plaintiff never appealed that grievance to CORC. And even if he did so at some later date, he did not obtain a final disposition of his appeal from the superintendent's August 28, 2011 letter before he filed the Amended Complaint two days later on August 30, 2011.  Having failed to

exhaust the grievance procedure before he filed the Amended Complaint,
Plaintiff is barred from complaining of the July 26 incident here.

### b.   Plaintiff Is Precluded from Litigating the Legal Adequacy of the July 2, 2011 Disciplinary Hearing

Plaintiff also challenges the disciplinary hearing held on July 2, 2011,
regarding the ticket Defendant Corcoran wrote on June 29, 2011, for Plaintiff's
beads being visible above his shirt collar.  Plaintiff alleges that the hearing
officer, Defendant Borawski, was biased against him and violated his due
process rights by failing to allow him to call Defendant Deputy Superintendent
Dolce as a witness.  Dolce's testimony was essential, Plaintiff argues, because
he alleges Dolce told him that he (Plaintiff) would no longer face discipline for
wearing his religious beads so that they were visible above the collar of his
shirt.  (Pl. Opp. 12, 19).

Plaintiff appealed that disciplinary hearing via an Article 78 proceeding
in New York State court where he raised exactly the arguments he raises here.
(Dkt. #133-1 at 16-19).  The New York State Supreme Court held that Plaintiff's
petition was "without merit."  (*Id.* at 43-44).  Because of this state court ruling,
Plaintiff is precluded from complaining of the disciplinary hearing here.

### i.   Issue Preclusion Generally

The Full Faith and Credit Statute, 28 U.S.C. § 1738, "requires federal
courts to give the same preclusive effect to state court judgments that those
judgments would be given in the courts of the State from which the judgments
emerged."  *Kremer* v. *Chem. Const. Corp.*, 456 U.S. 461, 466 (1982).  Under
New York law, issue preclusion — or, as it has sometimes been termed,

collateral estoppel — arises when a litigant asserts in a proceeding an issue of fact or law raised in a prior proceeding and two criteria are satisfied: (i) the issue "necessarily [was] decided in the prior action and is decisive of the present action"; and (ii) the prior action offered "a full and fair opportunity to contest the decision now said to be controlling." *Schwartz* v. *Pub. Adm'r of Bronx Cnty.*, 24 N.Y.2d 65, 71 (1969). "The party seeking the benefit of collateral estoppel bears the burden of proving the identity of the issues, while the party challenging its application bears the burden of showing that he or she did not have a full and fair opportunity to adjudicate the claims involving those issues." *Khandhar* v. *Elfenbein*, 943 F.2d 244, 247 (2d Cir. 1991).

The Second Circuit has held that when legal questions are determined in a prison disciplinary hearing and reviewed in an Article 78 proceeding, issue preclusion applies to those questions unless the litigant seeking to avoid preclusion can show that procedural deficiencies in the underlying disciplinary hearing had "some significant effect" on the adequacy of the subsequent state-court review. *Giakoumelos* v. *Coughlin*, 88 F.3d 56, 60 (2d Cir. 1996); *see also Fludd* v. *Fischer*, — F. App'x —, No. 12-3641-pr, 2014 WL 2535247, at *1 (2d Cir. June 6, 2014) (summary order) (finding preclusion where the issues in the federal litigation were raised and resolved in a previous Article 78 proceeding and there were "no procedural deficiencies in either the Article 78 proceeding or the [prison disciplinary] hearing that produced some significant effect on the review of these issues or otherwise prevented [the federal plaintiff] from fully litigating them in the Article 78 proceeding"). "Although a § 1983 claim for

56

damages is not barred by a judgment in an Article 78 proceeding, a federal plaintiff nonetheless may still be barred by the doctrine of collateral estoppel or issue preclusion from relitigating issues that were determined in that proceeding." *Robinson* v. *Scully*, No. 89 Civ. 7244 (RJW), 1993 WL 340998, at *4 (S.D.N.Y. Aug. 23, 1993).

### ii.    Plaintiff Is Precluded from Raising Here the Issues Previously Decided in the Article 78 Proceeding

With respect to the July 2 disciplinary hearing at Attica, Plaintiff argues that Borawski was biased against him and that it was a due process violation to deny his request to call Dolce as a witness. (Am. Compl. 9 of 22; Vann Dep. 79-81). These are precisely the arguments Plaintiff raised in his Article 78 proceeding challenging the hearing. (*See* Dkt. #133-1 at 18-19 of 87). Those issues were decided against Plaintiff in the state court judgment. (*Id.* at 43-44 of 87).

Plaintiff has made no showing that he lacked a full and fair opportunity to litigate these claims in state court. "Parties to a previous Article 78 proceeding generally have had a full and fair opportunity to litigate the issues raised in that proceeding." *Rahman* v. *Acevedo*, No. 08 Civ. 4368 (DLC), 2011 WL 6028212, at *5 (S.D.N.Y. Dec. 5, 2011) (citing *DiSorbo* v. *Hoy*, 343 F.3d 172, 183 (2d Cir. 2003)). Moreover, Plaintiff does not argue he was unable to introduce evidence at the Article 78 proceeding that, introduced here, might produce a different result. Just as in *Giakoumelos*, were "the district court to review the merits of all of [Plaintiff's] claims it appears that it would have before

57

it essentially the same record ... that [the court in the Article 78 proceeding] had before it.  88 F.3d at 61.

Instead, Plaintiff makes three arguments against preclusion.  (Dkt. #130).[23]  First, he argues that his claims here, made pursuant to Section 1983, "cannot be characterized as the same" as the claims brought in his Article 78 proceeding because "the relief" sought in the two actions is different.  (*Id.* at 1 of 7).  Plaintiff is correct that the instant Section 1983 action, in which he may seek money damages for constitutional violations, seeks relief unavailable in an Article 78 proceeding.  For that reason he is not precluded from bringing a claim in the first place.  *See Giakoumelos*, 88 F.3d at 61 (citing *Davidson* v. *Capuano*, 792 F.2d 275, 278 (2d Cir. 1986)).  But Plaintiff's argument confuses claim preclusion with issue preclusion.  While Plaintiff may be permitted to bring a particular type of *claim* in this proceeding, he may not relitigate specific *issues* that have already been decided against him in state court.

Second, Plaintiff argues that his state court action did not challenge the issues he raises here.  (Dkt. #130 at 1 of 7).  This is simply not true, as a cursory examination of his petition in the Article 78 proceeding and the ensuing judgment reveals.  (*See* Dkt. #133-1 at 18-19 of 87 (arguing in the

---

[23]    Plaintiff also insists in his reply that he requested that his *pro bono* counsel in the Article 78 proceeding appeal the adverse Wyoming County Supreme Court judgment to the Appellate Division, and that his counsel failed to do so.  (Dkt. #130 at 1, 5 of 7).  Even had the decision been appealed, "[u]nder New York law, 'the mere pendency of an appeal does not prevent the use of the challenged judgment as the basis of collaterally estopping a party to that judgment in a second proceeding.'" *DiSorbo*, 343 F.3d at 183 (quoting *Amica Mut. Ins. Co.* v. *Jones*, 85 A.D.2d 727, 728 (2d Dept. 1981)).  And whether Plaintiff's attorney defied Plaintiff's wishes or committed misconduct, though perhaps relevant elsewhere, simply has no effect here.

state court proceeding that "[Plaintiff] was denied his constitutional and statutory right to call witnesses at his disciplinary hearing" and "was denied the right to a neutral and detached hearing officer"); *id.* at 43-44 of 87 (ruling that "[t]he hearing officer properly denied the request for the testimony of the Deputy Superintendent" and that "the record fails to support the petitioner's contention that the determination in the case flowed from bias on the part of the hearing officer").

Finally, Plaintiff argues that Defendants should have raised the issue of preclusion "sooner." (Dkt. #130 at 1-2 of 7). It is true that "collateral estoppel, like res judicata, is an affirmative defense … [and, as] such, it normally must be pled in a timely manner or it may be waived." *Curry* v. *City of Syracuse*, 316 F.3d 324, 330-31 (2d Cir. 2003). The Supreme Court has explained that the purpose of requiring timely pleading of preclusion claims "is to give the opposing party notice of the plea of estoppel and a chance to argue, if he can, why the imposition of an estoppel would be inappropriate." *Blonder-Tongue Labs., Inc.* v. *Univ. of Illinois Found.*, 402 U.S. 313, 350 (1971). The Second Circuit has, on this basis, accepted preclusion defenses when raised long after the pleading stage where the non-movant has meaningful "notice and an opportunity to respond." *Curry*, 316 F.3d at 331. In *Curry*, the preclusion argument was not raised until the defendant's reply brief in further support of its motion for summary judgment. *Id.* Nonetheless, because the plaintiff had the opportunity to file a sur-reply opposing preclusion, the Second Circuit

concluded that, absent a showing of some prejudice to the plaintiff, the preclusion argument was not waived on timeliness grounds.  *Id.*

Here, Plaintiff has been on notice of Defendants' preclusion argument since they first moved for summary judgment. (Def. Br. 8-9).  He had an opportunity to object to that argument in his opposition brief and did not do so.  Out of solicitude for Plaintiff's *pro se* status, the Court ordered Defendants to file supplementary briefing on this topic and to produce the entire court file from the Article 78 proceeding. (Dkt. #124).  Plaintiff replied, raising several tailored and thoughtful objections to preclusion. (Dkt. #130).  Though those arguments proved unavailing, many lawyers could not have mounted as able an assault on Defendants' preclusion argument.  There can be no doubt that Plaintiff had meaningful "notice and an opportunity to respond" on this topic. *Curry*, 316 F.3d at 331.

Thus, the Court finds Plaintiff is precluded from litigating the issues of Dolce's hearing testimony and Borawski's bias, because they were raised in his Article 78 proceeding.  Summary judgment is granted against Plaintiff's claims arising from his July 2 disciplinary hearing.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED as to Plaintiff's religious discrimination, equal protection, and due process claims relating to his sacred beads and his due process claims arising from the July 2 disciplinary hearing at Attica.  He has failed to exhaust his administrative remedies regarding the remainder of his

claims arising from alleged events at Attica and so those claims are

DISMISSED.

The Clerk of Court is respectfully directed to terminate the motion

pending at docket entry 107 and to close the case.

SO ORDERED.

Dated:  August 25, 2014
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

*A copy of this Order was mailed by Chambers to:*

Kouriockein Vann
DIN# 10-A-0017
Box 4000
Stormville, NY 12582